IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville May 17, 2017

**DEMETRIUS HOLLINS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 09-05640     Lee V. Coffee, Judge

_____

**No. W2016-01359-CCA-R3-PC**

_____

A Shelby County jury convicted the Petitioner, Demetrius Hollins, of attempted second degree murder and especially aggravated robbery, and the trial court sentenced him to an effective sentence of sixty years of incarceration. This Court affirmed the Petitioner's convictions and sentence on appeal. *State v. Demetrius Hollins*, No. W2012-02001-CCA-R3-CD, 2013 WL 6199463, at *1 (Tenn. Crim. App., at Jackson, Nov. 25, 2013), *perm. app. denied* (Tenn. May 15, 2014). The Petitioner filed a petition for post-conviction relief alleging that he received the ineffective assistance of counsel based upon his trial counsel's failure to subpoena several alibi witnesses. After a hearing, the post-conviction court denied the Petitioner relief, and we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Monica A. Timmerman, Memphis, Tennessee, for the appellant, Demetrius Hollins.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stacy M. McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a 2008 robbery and shooting in a McDonald's parking lot. For these offenses, a Shelby County grand jury indicted the Petitioner for attempted first degree murder and especially aggravated robbery. A Shelby County jury convicted the Petitioner of the lesser-included offense attempted second degree murder and especially

aggravated robbery. The Petitioner appealed his convictions to this Court, and we summarized the facts presented at trial as follows:

At trial, Truman Greer testified that, on August 29, 2008, he stopped at a McDonald's restaurant on the way home from work with his co-workers, Calvin Walker and "Little Joe." Mr. Greer parked in the McDonald's parking lot, and his co-workers walked toward the restaurant. Mr. Greer remained in his car, and he decided to count the money he had received earlier from cashing his paycheck. While he was counting his money, he noticed a black man wearing a blue bandana to the left of his periphery; the bandana was covering the man's nose and mouth. Mr. Greer "just froze" when he saw the man, out of concern that the man would notice the cash he was holding. The man approached the car parked directly to the left of Mr. Greer's vehicle. Mr. Greer heard the man say something to the effect of, "Give me your money, sucker," followed by the "bang" of a gunshot, at which point Mr. Greer saw the victim slump over in the driver's seat of his vehicle. The gunman reached inside the victim's vehicle and took something from the victim's person. Mr. Greer watched the shooter run across the street and out of his line of vision. Mr. Greer ran inside the McDonald's to get assistance for the victim.

On cross-examination, Mr. Greer acknowledged that, in the statement he gave to the police on the evening of August 29, 2008, he described the gunman as either five feet, four inches or five feet, five inches tall and estimated his age to be between 19 and 20. Mr. Greer explained, however, that he was merely guessing, due to his very brief observation of the gunman.

Calvin Walker testified that, when Mr. Greer parked his vehicle in the McDonald's parking lot, he and Joseph Brown, or "Little Joe," got out of the car, and as they began walking toward the restaurant, a white Lincoln Town Car with three men inside nearly ran over them. The two gentlemen continued toward the restaurant. Mr. Walker opened the door for Mr. Brown, and before Mr. Walker could step inside, he heard a gunshot. Mr. Walker later gave a description of the three men to law enforcement officers, describing two of the men as having "braids and tweeds in their head" and stating that the other man was bald. Mr. Walker testified that one of the men "was young" but the other two men appeared to be in their mid-30s. Mr. Walker also recalled that the Lincoln had a "[b]lue or red rag top on it." After he heard the gunshot, Mr. Walker saw a man running away from the McDonald's. The man he saw fleeing from the scene had

2

"little tweeds or braids in his head" and was wearing a white t-shirt and blue shorts. Mr. Walker did not notice a bandana. Mr. Walker told Mr. Brown to get help for the victim, and Mr. Walker took off his shirt and wrapped it around the head of the victim in an attempt to stop the bleeding from the gunshot wound.

Mr. Walker testified that the victim was "hysterical." Mr. Walker asked the victim if he knew the man who had shot him, and the victim told Mr. Walker that "he knew who had did it to him" although he did not give Mr. Walker a name. Mr. Walker observed that the victim had been shot in the head, and he stated that "blood was everywhere." Emergency medical personnel arrived five to 10 minutes later. Mr. Walker testified that he told law enforcement officers at the scene that the victim knew who had shot him. Mr. Walker also informed law enforcement officers that he was only able to see the side of the gunman's face as he was fleeing from the scene. Mr. Walker was never shown a photographic lineup. At trial, Mr. Walker positively identified the [Petitioner] as the man he saw running from the crime scene on August 29.

On cross-examination, Mr. Walker denied telling law enforcement officers on the evening of August 29 that the victim did not know who shot him. When defense counsel provided Mr. Walker with a copy of his signed statement, Mr. Walker denied that the signature on the document was his. Mr. Walker also denied telling the [Petitioner's] private investigator that the victim did not know who had shot him.

Joseph Brown testified that he accompanied Mr. Greer and Mr. Walker to a McDonald's restaurant on August 29 at the end of the work day. Mr. Brown went inside the restaurant to place his order, and while he was in inside, he heard a gunshot. Mr. Brown waited inside the restaurant for "a minute" before walking outside. When he walked outside, he saw the victim "slumped over in the car" with "a whole lot of folks trying to help him." Mr. Brown never spoke with anyone about the crime because he "didn't see nothing."

The victim, Willie Edwards, testified that he stopped at the McDonald's restaurant on August 29 before reporting for his shift at a Krystal restaurant. After ordering his food inside the restaurant, he returned to his vehicle in the parking lot. He opened his car door, placed his bag of food on the passenger seat, and sat down in the driver's seat, but before he was able to close the driver's door, a man approached him and

demanded that Mr. Edwards "give [him] something." When making this demand, the gunman lifted the hem of his shirt to reveal a small, black revolver. Mr. Edwards took the gunman's demand to mean that he wanted money, and Mr. Edwards replied that he had nothing to give the man. Mr. Edwards admitted at trial that he actually had $350 in cash in the right front pocket of his shorts. After indicating to the gunman that he had no cash, Mr. Edwards next remembered waking up on the passenger side of his vehicle, holding the left side of his head behind his ear. He was covered in blood and was in pain. Mr. Edwards recalled a man at his side, instructing him to stay still and applying pressure to his head wound. Mr. Edwards testified that he had never seen that man before and that he had not seen him since the shooting until he arrived at court to testify. Mr. Edwards did not recall speaking to any law enforcement officers at the scene of the shooting.

Mr. Edwards described the gunman as a dark-skinned male with short braids in his hair. Mr. Edwards did not recall anything covering the gunman's face. He testified that he had seen the gunman before because the gunman "used to stay in the same apartments that [Mr. Edwards'] sister used to stay in" and where Mr. Edwards formerly resided when he was a teenager. Mr. Edwards stated that he had seen the gunman around the Tulane apartment complex nearly every day "[f]or about six months to a year." Mr. Edwards stated that the gunman's apartment was "one door down" from Mr. Edwards' sister's apartment. At the time of the shooting, Mr. Edwards had not seen the gunman in five to six years.

Mr. Edwards testified that he recalled arriving at the hospital in the ambulance but that he remembered nothing after that point until he awoke in the hospital with staples on the left side of his head and a large scar behind his ear. He stated that he has lost all hearing in his left ear. Mr. Edwards testified that a law enforcement officer spoke with him after he awoke from surgery on August 30, and Mr. Edwards informed the officer that he knew who had shot him, identifying the gunman by his nickname, "Main." Mr. Edwards provided the officer with identifying information about the gunman, including the name of the gunman's girlfriend and the address of the apartment where the gunman formerly resided. Mr. Edwards testified that, after providing the officer with this information, the officer returned later that same day with a photographic lineup, from which Mr. Edwards immediately identified the [Petitioner] as the man who shot him. Mr. Edwards stated that he did not realize the defendant had stolen his $350 until he was released from the hospital.

4

On cross-examination, Mr. Edwards acknowledged that, when he was residing at the Tulane apartments, he did not know the [Petitioner] but that rather he was someone Mr. Edwards would see in passing. He agreed that he had no disagreements or altercations with the [Petitioner] while living at the Tulane apartments. Mr. Edwards testified that he did not recall anything he might have said to Mr. Walker at the scene of the shooting before emergency medical personnel arrived, nor did he recall speaking to law enforcement officers shortly after the shooting.

On redirect examination, Mr. Edwards acknowledged that he had spoken with Mr. Walker and some other people while in a waiting room prior to his testimony. He denied speaking with any of them about the case or discussing their testimony.

Sergeant Charles C. Smith with the Memphis Police Department ("MPD") testified that, on August 29, 2008, he was assigned to Felony Response and was called to a shooting at a McDonald's restaurant. When he arrived at the scene, he encountered a grey Ford Escort with an open driver's door. He noticed what appeared to be blood on the driver's seat, as well as a McDonald's drink cup and bag of food located on the console between the front seats. Mr. Edwards had already been removed from the vehicle and transported to the hospital. On cross-examination, Sergeant Smith acknowledged that one of the witnesses to the shooting described seeing a white Lincoln Town Car with a tan top and Mississippi tags at the scene, but the sergeant admitted that the MPD did not issue an "APB" on the vehicle.

MPD Lieutenant Byron Hardaway testified that his supervisor sent him to the Regional Medical Center ("the Med") on August 29 to ascertain the condition of a shooting victim. Once Lieutenant Hardaway arrived at the Med, he spoke with the trauma center physician, who informed him that the victim, Mr. Edwards, was in critical condition but was alert. Lieutenant Hardaway was directed to a trauma room, where he encountered Mr. Edwards lying on a gurney with his eyes open, awaiting a "CAT" scan. Lieutenant Hardaway testified that he introduced himself and asked Mr. Edwards if he knew who shot him, to which Mr. Edwards replied, "I don't know." Lieutenant Hardaway stated that Mr. Edwards' speech was slurred and barely comprehensible. Believing Mr. Edwards to be under the influence of medication, Lieutenant Hardaway decided not to speak with him any further at that time.

5

MPD Officer Terrence Holt testified that he was the first officer to arrive on the scene of the shooting on August 29. When he arrived, he noticed a crowd gathered around Mr. Edwards' vehicle. Mr. Edwards was slumped over in the driver's seat of the vehicle with his left leg hanging out of the driver's side door, and he was rocking back and forth and bleeding from a head wound. Officer Holt attempted to question Mr. Edwards, but Mr. Edwards could not respond. Officer Holt testified that it appeared as if Mr. Edwards wanted to speak to him but was unable to do so.

MPD Sergeant J.D. Smith testified that he was with the Robbery Bureau in August 2008. Mr. Edwards' case was assigned to him on August 30, at which time Sergeant Smith and his partner proceeded to the Med to speak with Mr. Edwards. When Sergeant Smith arrived, Mr. Edwards' head was bandaged, and Sergeant Smith described Mr. Edwards' demeanor as "calm and simple." When Sergeant Smith inquired who had shot Mr. Edwards, Mr. Edwards responded that he knew the gunman, whom he knew as "Main," from the Tulane Apartments where "Main" had resided with his girlfriend, Wanda. Sergeant Smith used this information to determine that the defendant was the man known as "Main." Sergeant Smith then compiled a photographic lineup, which he presented to Mr. Edwards, and Mr. Edwards "immediately" identified the [Petitioner] as the man who shot him.

On cross-examination, Sergeant Smith acknowledged that his superior officer did not agree to issue an arrest warrant immediately after Mr. Edwards' identification of the [Petitioner] from the photographic lineup, believing that not enough evidence existed to issue a warrant at that time.

With this evidence, the State rested its case. Following the trial court's denial of the [Petitioner's] motion for judgment of acquittal and a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the [Petitioner] elected not to testify but did choose to present proof.

MPD Sergeant Investigator Robert Tutt testified that he interviewed Mr. Walker following the shooting on August 29. In the course of that interview, Sergeant Tutt asked Mr. Walker if he had spoken with the victim, and Mr. Walker responded that he had asked the victim who had shot him. Sergeant Tutt stated that Mr. Walker told him "that the victim had been shot in the head and he wasn't talking" and that "he wasn't really

6

saying anything." Sergeant Tutt testified that Mr. Walker also told him that the victim "said he didn't know who shot him." Sergeant Tutt testified that it was his practice to ask witnesses to review and sign their statements, and he stated that he had never forged a signature on a witness's statement.

Private investigator Lorea Negroni testified that she interviewed Mr. Walker at the behest of the [Petitioner] on May 11, 2011, at Mr. Walker's place of employment. Ms. Negroni testified that Mr. Walker was "very open," describing what he had seen on August 29, 2008, and providing Ms. Negroni with his telephone number in the event that she needed to speak with him again. Ms. Negroni stated that Mr. Walker told her that he had asked the victim who had shot him and that the victim replied that he did not know. Ms. Negroni described the interview as "pleasant" and denied that Mr. Walker had been uncooperative with her.

Based on this evidence, the jury convicted the [Petitioner] as charged of especially aggravated robbery and the lesser offense of attempted second degree murder.

*Hollins*, 2013 WL 6188463, at *1-5. On appeal, this Court affirmed the Petitioner's convictions and sentence. *Id.* at *1.

### B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief in which he alleged that his trial counsel was ineffective for failing to subpoena several alibi witnesses. At a hearing on his petition, the Petitioner testified that Counsel represented him at trial. The first time he met with Counsel was sixteen months after his appointment. He said that the two only spoke for "two or three minutes" and that they did not have time to exchange information. The Petitioner said that he attempted to tell Counsel about alibi witnesses but that they did not have time. The Petitioner said that he sent Counsel several letters with information about these witnesses, which included the witnesses' contact information, but that Counsel never mentioned this or found them.

The Petitioner said that one alibi witness was his sister, Canitra Hollins. He explained that, on the night of the shooting he was babysitting his nieces and nephews and did not leave them until his sister returned from her place of employment. He said that she would have confirmed that it was not possible that he committed this crime. The Petitioner testified that two of the other alibi witnesses had died prior to his trial.

7

The Petitioner said that he had been misidentified. He said that he wanted the victim's medical records because he doubted that the victim had actually been injured. The Petitioner opined that, had the medical records been introduced, it would have proven that the victim lied about being injured.

The Petitioner stated that his conviction was based upon judicial misconduct because the trial judge should have been more familiar with his case and had the medical records available before he proceeded to trial. He further felt that the trial judge erroneously included certain issues within the jury instructions, such as reckless endangerment. The Petitioner was uncertain as to how this affected the outcome of his trial. He said that the trial judge failed "to let the jury process" and assess "the credibility of witnesses."

He further alleged that the prosecutor committed misconduct because the prosecutor coached all the State's witnesses, which was made obvious because there was a "recess" after every witness. The Petitioner said it was "obvious" that during every recess the prosecutor forced the witnesses to say "things" that they actually did not see. He further said that the prosecutor committed misconduct by using the erroneous testimony of Mr. Calvin Walker.

The Petitioner explained that Mr. Walker was not the victim but was a witness. His testimony was "weak." He felt that had Counsel questioned Mr. Brown (another witness) vigorously, it would have proven that Mr. Walker was lying. The Petitioner agreed that Mr. Brown and Mr. Walker did, in fact, testify at trial that they were in the restaurant together at the time of the shooting and that they did not see the shooter. The Petitioner complained, however, that Counsel did not cross-examine the witnesses about this himself and, instead, only the State questioned them. The Petitioner contended that his conviction was based on "illegal evidence," that being the false statements of these witnesses.

The Petitioner testified that Counsel failed to call as witnesses Ms. Barbara Goldsmith and Mr. Gathright. The Petitioner said that he was at Mr. Gathright's house preparing for a party for his own son. Mr. Gathright, an employee of the Memphis Regional Medical Center, was like a stepbrother to him and agreed to host the Petitioner's son's party. Ms. Goldsmith intended to invite her grandchildren to the party. The Petitioner said that his son's mother brought his son to the Petitioner's sister's house but that his sister had plans to attend a basketball game. He said he did not see his son that evening.

When questioned further, the Petitioner contradicted his prior testimony that he had been at his sister's house and said that he was at "Ms. Nadine's house . . . Lucy, in

8

Lakeland" at the time of the shooting. He said that he told Counsel this fact and gave Counsel contact information for Ms. Nadine.

The Petitioner testified to several other allegations that he has not pursued on appeal.

During cross-examination, the Petitioner said that he only had one court date in sixteen to eighteen months and that this court date was the only time that he met Counsel. He said Counsel never came to visit him in jail and that the two only spoke for "maybe two minutes."

The Petitioner clarified that he babysat for his sister the night of the shooting until she arrived home, then he went to "[Ms. Nadine's house] Lucy, in Lakeland." He said that there was "no way possible" that he could have left his sister's when she arrived home and made it to the McDonald's by the time of the shooting. He said that he left his sister's house before his son's mother arrived there with his son because he did not know that she was coming. He said he was rushing to Ms. Nadine's house.

The Petitioner agreed this his sister was unwilling to testify and that both Ms. Goldsmith and Mr. Gathright were deceased. He said that Ms. Nadine was not present at the post-conviction hearing to testify.

Upon questioning from the court the Petitioner said that he had only learned that day that anyone had spoken to his sister and that she refused to testify. He said, however, that Counsel should have subpoenaed her work records to show what time she left work, which would have supported his contention that he was at her house until after she arrived. He further stated that, while his case had been set for trial twice before his actual trial date, he never saw Counsel on those occasions.

Counsel testified that, when the court first appointed him to this case, it was set for trial with a different judge, and the Petitioner also had a pending federal firearms-related charge. Counsel conferred with the Petitioner's federal public defender. The federal public defender recommended that the Petitioner be transferred to federal custody in order to arrange a plea deal where the Petitioner's sentences for his state offenses would run concurrently with his sentences for his federal convictions, which was not possible if he was in State custody. This arrangement ended up not coming to fruition, so Counsel "shift[ed] gears" and began preparing for trial.

Counsel testified that the Petitioner told him that he was at a birthday party at the time of the shooting and was not present. He offered Counsel some names of potential alibi witnesses. Counsel hired an investigator to interview the witnesses, knowing that he

9

might need the investigator to testify about the meetings. He gave the investigator the names of every alibi witness provided to him by the Petitioner. One witness, the Petitioner's sister, stated that she loved the Petitioner but that she would not "lie for him." Counsel said that the investigator met directly with the Petitioner on more than one occasion, and the investigator and Counsel followed up on all the leads provided to them by the Petitioner.

About the Petitioner's sister's potential testimony, Counsel said that even if she were to testify that the Petitioner was with her children until 4:30 or 5:00 p.m., it did not provide him an alibi. The shooting occurred at 5:30 p.m. Further, he sensed "hesitance" and "suspicion" from the Petitioner's sister, which he felt the jury would also note if she testified.

Counsel said that both he and the investigator felt that the people the Petitioner had identified as witnesses actually believed that the Petitioner had committed the crime. They felt it would be "completely destructive" to call them to testify. Counsel said that he and the investigator sought and reviewed information related to the anonymous tip and about Shelby Watkins, who was the victim's girlfriend. Ms. Watkins identified the Petitioner as the shooter, and Counsel said he would not want to call a witness who would have inculpated his client.

Counsel said that he met with the Petitioner both in jail and in the holding area for court on multiple occasions.

Counsel testified that he did not argue that the shooting never occurred and that the victim had never been shot. He said that to argue this point would not have been "effective lawyering." Instead he chose to argue that the circumstances under which the victim rendered the identification were questionable and that someone gave the victim the Petitioner's name as the shooter; thus, when the victim looked at the photo identification, he was attempting to pick out someone who he already had in his mind. Therefore, he argued, the jury should not trust the victim's identification. Counsel said that his strategy was successful in that the jury convicted the Petitioner of a lesser-included offense.

Counsel said that he raised all relevant issues on appeal. He brought on an assistant to help him, and the two left "no stone unturned" in seeking viable appellate issues.

During cross-examination, Counsel testified that the Petitioner was adamant that he was at a birthday party at the time of the shooting. He said that although he could prove that the Petitioner's son had a birthday on that date, his entire investigation did not

support the Petitioner's statements. Counsel, therefore, focused on a trial strategy that included discrediting the identification of the Petitioner as the shooter.

Upon questioning by the trial court, Counsel testified that he met with the Petitioner on multiple occasions. The first one or two meetings focused on working something out with his federal public defender. Then, as they focused on trial, he met with the Petitioner on multiple occasions, and the investigator also met with the Petitioner. He said that, if the Petitioner had a viable alibi defense, Counsel would have pursued it.

Based upon this evidence, the post-conviction court denied the Petitioner's petition for post-conviction relief.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied him post-conviction relief. He asserts that Counsel was ineffective because he failed to call witnesses that, while not strictly alibi witnesses, would have established a timeline for the jury that would have demonstrated the "improbability of [the] Petitioner's presence at the crime scene." The State counters that the Petitioner failed to prove that he received the ineffective assistance of counsel. We agree.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6

S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

"'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In this case, the post-conviction court found that Counsel effectively represented the Petitioner and did an "exceptional job," even persuading the jury to convict the Petitioner of a lesser-included offense. The post-conviction court noted that Counsel and an investigator had both attempted to locate and interview any potential alibi witnesses. It accredited Counsel's testimony that he did not present those witnesses because not only did they not offer an alibi but they also appeared to him to have believed that the Petitioner committed this shooting. The Petitioner's sister informed Counsel that she would not come to court and "lie" for him. The post-conviction court found that Counsel's decision not to call these witnesses was not ineffective. It further noted that it could not speculate about what any potential alibi witness would have testified, and the Petitioner had failed to call those witnesses at the post-conviction hearing. The post-conviction court "rejected th[e] contention" that Counsel never went to see the Petitioner and it accredited Counsel's testimony.

We conclude that the evidence does not preponderate against the post-conviction court's findings of fact. The record supports that Counsel met with the Petitioner, developed an appropriate trial strategy, and investigated the case adequately. The Petitioner offered alibi witnesses to Counsel, but those witnesses were not with the Petitioner at the time of the offense and seemed skeptical about whether he had committed the shooting. Counsel used sound legal discretion when choosing not to present those witnesses. The Petitioner has not presented those witnesses at his post-conviction hearing, and one of them, his sister, declined to testify at the post-conviction hearing. The Petitioner is not entitled to relief.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the post-conviction court's denial of the Petitioner's petition for post-conviction relief.

13

_____
ROBERT W. WEDEMEYER, JUDGE